THE STATE OF OHIO, APPELLANT, v. PEELER, APPELLEE.

[Cite as *State v. Peeler*, 99 Ohio St.3d 151, 2003-Ohio-2903.]

(No. 2002–0230—Submitted February 26, 2003—Decided June 18, 2003.)

PFEIFER, J.

### Factual and Procedural Background

{¶ 1} On June 29, 2000, defendant-appellant, Dawn Peeler, a nurse, was charged with five counts of illegal processing of drug documents in violation of R.C. 2925.23(A). She was also charged with one count of theft of drugs in violation of R.C. 2913.02(A)(2), but that charge is not at issue in this appeal. The document charges arose from Peeler's alleged falsification of proof-of-use sheets and medication-administration reports ("MARs") used by her employer, Washington Manor Nursing Home, to track the drugs it dispensed to its residents.

{¶ 2} Prior to trial, Peeler filed a motion in limine seeking to prevent the state from presenting at trial the proof-of-use sheets and MARs at issue. The trial court granted that motion. The court acknowledged that R.C. 2925.23(A) prohibits anyone from "knowingly mak[ing] a false statement in any prescription, order, report or record required by Chapter 3719," but held that the records at issue were not required by R.C. Chapter 3719 and that they therefore could not be used to establish a violation of R.C. 2925.23(A). After the court granted the motion in limine the prosecuting attorney stated that without that evidence the

state would not be able to prove the charges. The trial court then dismissed the document falsification charges against Peeler.

{¶ 3} The court of appeals affirmed the judgment of the trial court. The cause is before this court upon the allowance of a discretionary appeal.

## Law and Analysis

{¶ 4} R.C. 2925.23(A) provides that "[n]o person shall knowingly make a false statement in any prescription, order, report, or record required by Chapter 3719. * * * of the Revised Code." The outcome of this case hinges on whether the documents allegedly falsified by Peeler were records required by R.C. Chapter 3719.

{¶ 5} The General Assembly enacted R.C. Chapter 3719, Ohio's Controlled Substances Act, in an attempt to regulate controlled substances in the state. One goal of the Act is to control the abuse of prescription drugs. To help achieve that goal, R.C. 3719.07 requires certain recordkeeping of those who prescribe, manufacture, and distribute controlled substances. At issue in this case is R.C. 3719.07(B)(3), which provides:

{¶ 6} "Every category III terminal distributor of dangerous drugs shall keep records of all controlled substances received or sold. The records shall be kept in accordance with division (C)(3) of this section."

{¶ 7} There is no dispute that Washington Manor is a category III terminal distributor of dangerous drugs. "Category III" refers to a specific category of drugs. See R.C. 3719.01(FF), 4729.54(A)(3), 4729.54(A)(6), and 3719.41. And R.C. 4729.01(Q) defines "[t]erminal distributor of dangerous drugs" to mean "any person * * * who has possession, custody, or control of dangerous drugs for any purpose other than for that person's own use and consumption, and includes * * * nursing homes * * * and all other persons who procure dangerous drugs for sale or other distribution by or under the supervision of a pharmacist or licensed health professional authorized to prescribe drugs."

{¶ 8} As a terminal distributor of dangerous drugs, Washington Manor was required by R.C. 3719.07(C)(3) to keep records that contained the following:

{¶ 9} "(a) The description of controlled substances received, the name and address of the person from whom the controlled substances are received, and the date of receipt;

{¶ 10} "(b) The name and place of residence of each person to whom controlled substances * * * are sold, the description of the controlled substances sold to each person, and the date the controlled substances are sold to each person."

{¶ 11} The issue herein is whether Washington Manor *sold* controlled substances to its residents, thereby triggering the R.C. 3719.07(C)(3)(b) requirement

of proof-of-use sheets and MRAs. Although the proof-of-use sheets and MRAs are not included in the record, we assume that since the dispute herein focuses on R.C. 3719.07(C)(3)(b), those documents contain the information required by that subsection.

{¶ 12} Testimony at the hearing established that Washington Manor did not sell—as the term is commonly used—drugs to its residents. Washington Manor residents got their medications by first having their doctors write prescriptions. The prescriptions were then sent to a pharmacy, which filled the prescription and sent the drugs to Washington Manor. The pharmacy then billed either the resident or the resident's insurance company. When Washington Manor received the drugs, the nurses placed them in a medication cart and took them to the appropriate residents.

{¶ 13} Thus, Washington Manor simply acted as a conduit from the pharmacy to the resident. However, in the context of R.C. Chapter 3917, this action fits within the definition of "sale." R.C. 3719.01(AA) defines "sale" as follows:

{¶ 14} " 'Sale' includes delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee."

{¶ 15} Since delivery is included within the meaning of the term "sale," the delivery of drugs by nurses to residents constitutes a sale under the statute. Thus, the name of each person to whom controlled substances are delivered, the description of the controlled substances delivered, and the date the controlled substances are delivered must be recorded by Washington Manor. R.C. 3719.07(C)(3)(b).

{¶ 16} However, the court of appeals held that Washington Manor nurses did not deliver the drugs. The appellate court opinion states that Washington Manor's "sole function is to receive the delivery from the pharmacy and to administer the drugs to the patient." In analyzing the statute, the court of appeals was persuaded by the presence of a separate statutory definition for the term "administer," which it saw as the nurses' true function at Washington Manor. The court reasoned that if the General Assembly had intended to require R.C. 3719.07(C)(3)(b) information for the function performed by the nurses it would have required that such records be kept for the *administering* of controlled substances, rather than for their sale.

{¶ 17} "Administer" is defined at R.C. 3719.01(A) as follows:

{¶ 18} " 'Administer' means the direct application of a drug, whether by injection, inhalation, ingestion, or any other means to a person or an animal."

{¶ 19} Our interpretation of the definition of "administer" yields a different conclusion from that of the appellate court. The statutory definition of "adminis-

ter" includes only the *direct* application of a drug. A nurse's bringing pills to a nursing home resident for that resident to take himself is not the direct application of a drug. The direct application of the drug in that instance is left to the resident. The appellate court's interpretation implies that "administer" is an administrative or clerical pursuit, including bringing the drug to the resident. In fact, the statutory definition addresses only the medical process of the direct, physical application of the drug.

{¶ 20} While Washington Manor nurses do not directly apply drugs to every resident that has been prescribed them, they do in fact *deliver* the drugs to the residents in every case. If the General Assembly had made nursing homes responsible for keeping records of only the drugs that their staffs administer, rather than deliver, it would have left a gap in the recordkeeping for those drugs not directly applied by the staff.

{¶ 21} Our interpretation of R.C. 3719.07 is consistent with the legislative intent behind R.C. Chapter 3719. Only through our interpretation does the statute provide a record of the drugs from the time they are prescribed to the time they reach the patient. Without a requirement of recordkeeping for the delivery of controlled substances, the record would stop before the drugs reached the patient if the patient lived in a nursing home. We believe that the General Assembly specifically included nursing homes within the ambit of R.C. 3719.07 to make them responsible for keeping records of the drugs they handle. The high quantity of drugs present in a nursing home, the often reduced awareness of the residents for whom they are prescribed, and the ease with which prescription pills could otherwise be pilfered are factors necessitating the keeping of records of drugs delivered within nursing homes.

{¶ 22} Therefore, we find that if the records at issue in this case, i.e., the proof-of-use sheets and MARs, contained the information required by R.C. 3719.07(C)(3)(b), then falsification of such records would constitute a violation of R.C. 2925.23(A). Accordingly, these documents are relevant in prosecuting an alleged violation of R.C. 2925.23(A). Consequently, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings.

Judgment reversed
and cause remanded.

MOYER, C.J., RESNICK, F.E. SWEENEY, CORRIGAN, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

MICHAEL J. CORRIGAN, J., of the Eighth Appellate District, sitting for COOK, J.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Johnna M. Shia, Assistant Prosecuting Attorney, for appellant.

Joyce A. Rollert and Michael L. Monta, for appellee.